In The



Court of Appeals



Ninth District of Texas at Beaumont


____________________



NO. 09-05-215 CR


____________________



KENNETH LEE PIEROTT, JR., Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 252nd District Court


Jefferson County, Texas


Trial Cause No. 91638






MEMORANDUM OPINION


 A jury convicted appellant Kenneth Lee Pierott, Jr. (1) of murder and assessed
punishment at sixty years of confinement. Pierott filed this appeal, in which he raises two
issues for our consideration. Pierott argues that the trial court erred by admitting eleven
autopsy photos of the deceased and that the evidence was factually insufficient to support the
jury's verdict. We affirm the trial court's judgment.

The Evidence


 Kathy Odoms testified that on April 16, 2004, she was living with her two sons: Tre-Devin, age six, and Jacory, age two. Odoms testified that Pierott is Jacory's father. 
According to Odoms, Pierott initially had a good relationship with Tre-Devin, but after
Jacory's birth, Pierott began to have problems with the fact that Tre-Devin had a different
father. Odoms further testified that Pierott was jealous of Tre-Devin's father. Pierott also
began to question Odoms's care of Jacory, and Pierott told Odoms that he felt she was giving
more attention to Tre-Devin than to Jacory. Odoms and Pierott fought frequently about her
level of attention to Jacory, and she began trying to get away from Pierott because their
relationship had deteriorated. According to Odoms, Pierott eventually began stalking her. 
 On April 16, 2004, Odoms and Pierott played dominoes and smoked marijuana.
Odoms testified that Pierott acted strangely that day. According to Odoms, Tre-Devin and
Jacory arrived home from daycare at approximately 7:00 p.m., and Pierott spent the night at
Odoms's home. Odoms planned to awaken early the following day to get her children ready
for school. Odoms put the children to bed in their room and she decided to go to bed;
however, she felt uneasy because Pierott was pacing and talking to her. Pierott discussed
religion, and he claimed that he was God. Pierott also asked Odoms if she was reading his
mind, and he looked around as though he were hearing voices. Pierott also asked Odoms if
she was his messenger or if he was her messenger. When Odoms fell asleep, Pierott was still
pacing. Odoms explained that Pierott talked to her about religion off and on throughout the
night. Odoms further testified that Pierott had previously told her that he was God, that he
would never die, and that Jesus Christ did not exist. Odoms testified that Pierott had also
previously told her God was black and the devil was white, and it bothered Pierott that Tre-Devin's father was white.

 When Odoms awakened, Pierott was standing in front of her. Pierott told Odoms to
go back to sleep, and she said she had to get the kids dressed and go to work. Pierott
responded that she "didn't have to worry about that anymore." Odoms entered the kitchen
because the residence was hot and she smelled gas. Odoms turned off the burners on the
stove. Odoms testified that she then began to gather clothes for the children, and Pierott
disappeared. Odoms noticed that Tre-Devin was not in his bed, and she began searching for
him. Odoms also noticed that Jacory was in her bed. Odoms saw that her car was gone, and
she called Pierott's brother, Daniel Pierott, and told him that "something wasn't right[,]" and
that she believed Pierott had stolen her car. After she hung up the phone, Odoms went into
the kitchen, opened the oven door, and found Tre-Devin's body inside the oven. Odoms
called 911, and she called Pierott's brother and accused Pierott of killing Tre-Devin. Odoms
testified that when she went to bed the previous night, the oven racks were inside the oven,
but the racks had been removed when she found Tre-Devin. Odoms never heard the metal
racks being removed.

 Brian Tully of the Beaumont Fire Department testified that he was dispatched to
Odoms's residence. When he arrived, Odoms was hysterical, and she pointed toward the
kitchen. Tully also noticed that the house felt "kind of stuffy, like somebody had been
running a heater." Tully observed that the oven was open, and a young child was in a fetal
position inside the oven. Tully pulled the child out and checked for vital signs. Tully found
no vital signs, and he saw that rigor mortis had begun, so he knew the child was dead. Tully
then removed Odoms and another child from the house and secured the scene.

 Justin Arceneaux, a paramedic for the city of Beaumont, testified that he was
dispatched to Odoms's residence. When Arceneaux entered the residence, Tully informed
him that the child was dead. Arceneaux determined that the child had been dead "for quite
some time" because rigor mortis had set in, and there were lividity marks on the body. 
Arceneaux testified that a white, frothy substance had been expelled from the child's nose
and mouth. When police officers arrived, Arceneaux told them that Odoms had said her
boyfriend had killed the child. Arceneaux testified that Odoms was hysterical.

 Sue Kelly, an I.D. technician with the Beaumont Police Department, testified that she
was dispatched to Odoms's residence. When Kelly arrived, the police department had
already secured the scene. Kelly videotaped the scene and took still photographs. Kelly also
attended the autopsy of the child later that day and took photographs, which were admitted
into evidence as State's Exhibits 30, 31, 32, 33, 34, 35, and 36 over defense counsel's
objection.

 Daniel Pierott, Pierott's brother, testified that on April 16, 2004, he was at the home
of his children's mother. On that date, he gave a statement to officers from the Beaumont
Police Department. According to Daniel, Pierott does not have a driver's license, and Daniel
had never known Pierott to drive "until that morning[.]" Daniel testified that he received a
call from Odoms that morning, and Odoms told him she was looking for Pierott and Tre-Devin. Odoms told Daniel that Pierott had left the house and taken her car. Daniel testified
he found it strange that Pierott had taken Odoms's car because he had never known his
brother to drive before, and Pierott did not have a driver's license. According to Daniel,
Odoms also told him that she smelled gas and she thought something was wrong, so he
became concerned and decided to search for Pierott.

 As Daniel began to back out in his vehicle, he looked in his rearview mirror and saw
Pierott driving Odoms's car. Daniel ran to Pierott's car and flagged him into the yard, and
Daniel asked Pierott where Tre-Devin was. Pierott responded that the child was in the oven,
but Daniel did not understand what Pierott meant. Pierott told Daniel that Tre-Devin had
been in the oven all night long, and Daniel ran back into the house and called Odoms. Daniel
testified that when Odoms answered the phone, "[s]he was crying, screaming[,] and yelling,
'He killed my baby. He killed my baby.'" Daniel ran outside and asked Pierott if he had
killed Tre-Devin, and Pierott responded, "He's not dead. He just don't have a body to go
into." Daniel took Pierott to Houston to see their father, Kenneth Pierott, Sr. Daniel
explained that he decided to take Pierott to Houston "[b]ecause I felt like he wasn't in his
right state of mind and that the officers would probably do him harm in Beaumont. So, I took
him out there for his safety, to turn him in."

 During the drive to Houston, Pierott repeated that he had put the child in the oven, and
he also told Daniel that he had set the oven at six hundred degrees and had turned on the gas
burners on the stove. When asked whether Pierott was emotional, Daniel testified,
"Somewhat. He wasn't emotional as if to know what he had done." Pierott told Daniel that
he put Tre-Devin in the oven "so that [Jacory] could live, so that he could breathe, that Tre-Devin was draining the life out of his son." Pierott also told Daniel, "Everybody know[s]
what I did was right, man. I did that to save my son." Daniel testified that he cried during
most of the conversation, but Pierott did not cry. Pierott also talked to Daniel about the moon
and the stars, and he told Daniel that he should stop crying. According to Daniel, Pierott also
told him that he was "reversing mathematics[.]" When Daniel and Pierott arrived at their
father's house, Daniel told their father what Pierott had done, and their father called the
police.

 Daniel explained that prior to Tre-Devin's death, he noticed that Pierott had lost a
significant amount of weight, and Pierott talked about God and religion. Pierott told his
brother that Pierott was God, and Pierott preached to him about a Muslim book. Pierott also
told his brother that Pierott was one with the universe and could never die. In addition,
Pierott asked Daniel if Daniel was reading his mind, and he told Daniel that Daniel was his
messenger from God. Daniel testified that he had also seen Pierott pace back and forth, and
that Pierott sometimes turned his head as though he were hearing voices.

 Detective Robert Ener of the Beaumont Police Department testified that he was
dispatched to Pierott's mother's home on April 16, 2004. Pierott's mother consented to a
search of her residence, and the SWAT team conducted the search, but did not locate Pierott.
Detective Ener subsequently became aware that Pierott had admitted to Daniel that he had
killed Tre-Devin, and he and another detective interviewed Pierott in Harris County, where
Pierott was in custody. The detectives attempted to obtain a statement from Pierott, but they
were unable to do so. Detective Ener testified that Pierott was agitated during the
conversation, and that Pierott said that Tre-Devin was not really dead. According to
Detective Ener, Pierott "stomped his feet up and down, kind of imitating a small child
running through a room[,]" and Pierott looked around as if he were watching a child run
through the room. Pierott also accused Detective Ener of reading his mind, and he told
Detective Ener that he could read Detective Ener's mind. Pierott also said that Tre-Devin
was scattered all over the world. Pierott also told Detective Ener that Tre-Devin was sucking
the life from Jacory, and Detective Ener testified that he "took it to mean that [Pierott] had
done something to Tre-Devin so that [Tre-Devin] would not be in competition to [sic] his
son." Detective Ener testified that during the trip back to Beaumont, Pierott "talked about
that we were trying to get him to confess, and then he started in on he wanted to confess his
sins and pretty much prayed out loud all the way back to Beaumont." Pierott never admitted
the killing to Detective Ener.

 Forensic pathologist Dr. Tommy Brown testified that he was dispatched to the scene
where Tre-Devin's body was discovered. When Dr. Brown entered the scene, the oven lid
was down, and Tre-Devin was "laying on the oven lid that was lying down[,]" and the oven
grates "were over outside of the stove, over leaning against the wall." Dr. Brown performed
an autopsy on Tre-Devin's body. Dr. Brown's external examination of Tre-Devin's body
revealed the presence of carbonaceous debris consisting of soot, dirt, and burned food on the
right side of Tre-Devin's head in the temple and cheek area, as well as on the back of his
hands and distal forearms. Because the debris was stuck on rather than smudged or moved
about, Dr. Brown determined that Tre-Devin was either unconscious or dead when he was
placed in the oven.

 Dr. Brown also noted the presence of abrasions and marks on Tre-Devin's body. Over
defense counsel's objection, the trial court entered autopsy photographs that depicted the
abrasions and marks into evidence as State's Exhibits 40, 41, 42, and 43. Dr. Brown
explained that the photographs showed that there were "multiple small bruises or contusions
of [Tre-Devin's] head[,]" and the child also had a large bruise over his nose, a swollen and
bruised lower lip, and a bruise along the left side of his chin. According to Dr. Brown,
State's Exhibit 32 shows foam in the nostril, and Dr. Brown explained that the foam is a sign
of pulmonary edema, which occurs with asphyxia deaths. Dr. Brown explained that Tre-Devin also had impressions on his right lower leg and right foot that were from "the inside
of the oven where the grates slide in on the grate ledge . . . where his leg had been pressed
up against there."

 Dr. Brown opined that Tre-Devin "was most likely dead when he was placed into the
oven." Dr. Brown also performed a toxicology analysis, which ruled out the possibility that
Tre-Devin died from gas asphyxiation. Dr. Brown determined that Tre-Devin "died from
asphyxia due to smothering[,]" and Dr. Brown explained that the abrasions, contusions, and
bruises on Tre-Devin's face and head indicate that he had struggled. Dr. Brown testified that
he prepared an autopsy report, and the trial court admitted the autopsy report into evidence
as State's Exhibit 39. The State then rested.

 Psychiatrist Dr. Seth Silverman, a court-appointed expert on the issue of insanity, 
testified that he reviewed Pierott's hospital records, jail records, medical records, legal
records, and school records, and he interviewed Pierott five or six times. Dr. Silverman
estimated that he had spent at least fifteen to twenty hours with Pierott. Dr. Silverman also
briefly interviewed Pierott's father, mother, and aunt, and read the investigatory reports and
affidavits. Dr. Silverman first interviewed Pierott approximately one month after Tre-Devin's death. Dr. Silverman testified that Pierott "said many times he wasn't sure . . . if 
I was the devil because I was a white person. And that was kind of a theme during the time
that we talked."

 According to Dr. Silverman, Pierott "described in great detail what happened the day
that he killed Tre Odoms, repeatedly and pretty consistently." Dr. Silverman testified that
Pierott never denied participating in Tre-Devin's death. Dr. Silverman testified that Pierott
had changed significantly since their first meeting. Dr. Silverman explained, "I think the
most significant change, he's been on medication. He hadn't been taking medicine for about
four months at the time that this happened, and he had been taking it for a number of years
before that." Dr. Silverman described Pierott when he first met him as "grossly, grossly
psychotic." Dr. Silverman explained that although Pierott still has "underlying delusional
beliefs and he's basically psychotic, the medication keeps him much more organized and
logical about how he responds to things."

 According to Dr. Silverman, when he asked Pierott whether killing Tre-Devin was
right or wrong when he committed the murder, Pierott "told me that it was the right thing to
do. It had something to do with corrupting seeds, black people, white people." Dr.
Silverman further explained that by putting Tre-Devin in the oven, Pierott believed he was
somehow protecting Tre-Devin's soul from reentering his body, "[s]o, in some very bizarre
and psychotic way, that was his understanding and he knew it was right." According to Dr.
Silverman, since medication has made Pierott's thinking more logical, Pierott has "said he's
not sure but he thinks it might have been the wrong thing to do."

 Dr. Silverman noted that according to information from Pierott's mother, brother, and
Kathy Odoms regarding Pierott's weight changes, insomnia, talking to himself, and his
preoccupation with God, the devil, and seeds, Pierott's condition was deteriorating before
he killed Tre-Devin. Dr. Silverman opined that "the most significant thing is the fact he
didn't take the meds, he was getting more psychotic, there were other behaviors he
misinterpreted. And it eventually got to the point where his understanding of the external
world was so bizarre that he had to act on it or he felt he had to act on it."

 According to Dr. Silverman, psychiatrists must answer certain questions when
determining whether someone knew right from wrong, including whether the patient has a
severe mental disorder and whether the patient suffers from such a severe mental disorder
that he does not know the difference between right and wrong. Dr. Silverman opined that
Pierott suffers from chronic paranoid schizophrenia, which caused him to lose weight,
become delusional, believe he had magical powers, hear voices, experience sleep
disturbances, and become impaired in his speech. Dr. Silverman noted that Pierott's
symptoms escalated "for a number of months before this whole thing happened." Dr.
Silverman testified that based on "normal medical probability[,]" Pierott "absolutely did not"
know right from wrong when he killed Tre-Devin. Dr. Silverman explained, "[Pierott]
thought that it was the right thing to do. It was tied in to some underlying delusion that
continued to get worse with time." According to Dr. Silverman, "in this particular case,
there's no logical explanation for [Pierott's] behavior other than he didn't know it was
wrong." Dr. Silverman testified that Pierott suffered from a severe mental disorder when he
killed Tre-Devin, and Pierott "thought what he was doing was right at that time."

 On cross-examination, Dr. Silverman testified that before he wrote his report, he had
incorrectly believed that the trial court appointed him to assist the defense rather than to be
an objective medical expert. Silverman also testified that if he had been present for the
testimony of Daniel Pierott, his opinion might have changed. Dr. Silverman admitted that
he had reviewed a statement by Pierott's roommate, who opined that Pierott "just wants
people to think he's crazy." Dr. Silverman acknowledged it is possible that his own opinion
is incorrect and Pierott's roommate is correct.

 Dr. Silverman testified that in a prior criminal proceeding in which he served as an
expert witness, he considered filing a grievance against the prosecutor; he wrote a letter to
the judge that stated that the defense attorney appeared to be mentally ill and incompetent;
and he filed an ethics complaint against a psychologist who testified. Dr. Silverman also
testified that he has diagnosed patients as being mentally ill, yet those patients were later
diagnosed as malingerers. According to Dr. Silverman, the fact that Pierott fled the scene
of his crime does not indicate that Pierott knew what he was doing was wrong. However,
Dr. Silverman testified it was "possible" that Pierott's decision to wait until Odoms was
asleep to murder Tre-Devin indicates Pierott knew what he was doing was wrong. Dr.
Silverman opined that Pierott's choice to murder Tre-Devin quietly and at night did not
indicate that Pierott knew right from wrong. Dr. Silverman also testified that Pierott also
could have killed Tre-Devin for religious reasons rather than because of mental illness, but
Dr. Silverman did not believe that was the case. Dr. Silverman admitted that Pierott possibly
could have faked some symptoms so he could allow Jacory to have Odoms to himself.

 On re-direct examination, Dr. Silverman opined that "in all medical probability,
[Pierott] is absolutely not faking." Dr. Silverman testified that his opinion was not
influenced by the fact that defense counsel contacted him to serve as an expert. Dr.
Silverman also testified that he had reviewed Daniel's statement, and if Daniel's testimony
at trial was consistent with his statement, it would not change his opinion. According to Dr.
Silverman, "[i]f someone kills somebody intentionally and they're in their right mind, in all
medical probability, they would leave[,]" yet Pierott stayed in the residence for a significant
period of time after he killed Tre-Devin.

 Kenneth Pierott, Sr. ("Kenneth") testified that when Pierott and Daniel arrived at his
home in Houston, Daniel told him that Pierott had killed Tre-Devin. Kenneth indicated that
Pierott was not crying, did not seem upset, and acted as though he had done a good thing. 
Pierott told his father that it would not do any good to call Odoms because "'when you put
the phone up to your ear . . . you think you're talking to Kathy . . . but she's in your head and
she's coming out your head into the receiver and you're not really talking to her.'" Kenneth
testified that Pierott's eyes were glazed, he was calm, and he had a smile on his face. Pierott
told his father, "'Tre's not dead. Tre's not dead. He's okay now.'" Pierott also told his
father that he had left Tre-Devin in the oven overnight. Pierott's father testified that Pierott
"talked about a mission, being on a mission. What he did, he did it because God had him do
that. He was doing it for him, a good thing. He was doing a good thing." According to
Pierott's father, Pierott also said, "'I'm your seed. . . . You are me, and I am you. . . . And
I got a mission for you, too[.]'" Kenneth testified that he asked his mother to call the police,
and the police arrived and arrested Pierott. According to Kenneth, Pierott never refused to
answer any of the family's questions about what he had done to Tre-Devin.

 Detective Jason Hughes of the Beaumont Police Department testified that he was
dispatched to the scene at Odoms's residence. Upon arriving at the scene, Detective
Hughes's supervisors informed him that Pierott was a suspect. Detective Hughes was told
that Pierott had taken Odoms's car, and that many police units were searching for Pierott. 
Detective Hughes returned to the station, and he learned that Pierott was in custody in Harris
County. Detective Hughes's supervisor sent him and Detective Ener to Harris County to
return Pierott to Beaumont. Upon arriving at the constable's office in Harris County,
Detectives Hughes and Ener obtained affidavits from Daniel and his father.

 The detectives then brought Pierott into a private office and spoke with him after
reading him his rights. Detective Hughes testified that it was difficult to have a normal
conversation with Pierott because "he'd change the subject and move to something else; and
he would talk about . . . something like the moon or the stars and [Pierott] just . . . wasn't
making sense. And it was difficult to get even a common ground to be able to talk with him
on." According to Detective Hughes, Pierott also discussed reading the Bible and the Koran. 

 Pierott told Detective Hughes that Odoms "would get out of her chair, stare at the sun
and come back and stare at his eyeballs." Pierott said it burned him when Odoms stared at
him. Pierott also told Detective Hughes "that he felt that [Odoms] was living off his son, his
source of energy and felt like she was reading his mind. And then he said that it was the
same thing like I was doing now, as I was trying to type his words into the computer."
According to Detective Hughes, Pierott said Odoms was "coaching him to do stuff and
messing with his head[,]" and that it was difficult to "make rational sense of anything
[Pierott] was saying[.]" Pierott also said that he knew how to scatter across the earth. Pierott
told Detective Hughes that Pierott was the planet earth, Pierott was the master of the planet,
and that he would spit on his planet.

 Detective Hughes explained that when Pierott saw him typing into the computer, "he
just stopped talking at all." When Detective Hughes stopped typing, Pierott began talking
again. Pierott told Detective Hughes that the detectives "knew what happened with Tre and,
so, therefore, we didn't need to be asking him these questions because we already knew[.]" 
Pierott also said that Tre-Devin "was still alive and was shuffling his feet across the floor[.]" 
Pierott told Detective Hughes more than once that Tre-Devin "was not dead but just outside
his body[.]" Detective Hughes also testified that when he began to discuss Tre-Devin's
death, Pierott would immediately change the subject. When asked whether he believed
Pierott was purposely avoiding answering questions about Tre-Devin, Detective Hughes
responded, "You know, he may have been. If he was playing us, then he was doing a good
job because I didn't think he was rational[.]" Detective Hughes testified that he did not
obtain a written statement from Pierott.

 Detective Hughes testified that he and Detective Ener transported Pierott back to
Jefferson County. At one point during the trip, Pierott "started to get real loud and started
yelling in the back seat[.]" Detective Hughes explained that Pierott "started screaming real
loud. He started rapping. He was yelling how he was sanctified by the blood of the Lord,
Jesus Christ, and was yelling real loud in the back of the car to the point where it was fairly
tense." According to Detective Hughes, Pierott also ranted and raved about the detectives'
efforts to obtain a confession from him.

 Psychiatrist Dr. Edward Gripon testified that he met Pierott in the late 1990s when he
evaluated Pierott's mental health, and he has "intermittently seen him on numerous occasions
since that time up through 2005." Dr. Gripon testified he was asked to evaluate whether
Pierott was insane when he killed Tre-Devin. Dr. Gripon testified that any psychiatric
opinion must be given based upon reasonable psychiatric probability, since no one can give
such an opinion with absolute certainty. Dr. Gripon testified that in preparing to evaluate
Pierott, he reviewed offense reports, witness statements, and statements of individuals with
knowledge of Pierott "around the time of the offense or when it occurred[,]" including
Detectives Ener and Hughes, Kathy Odoms, Kenneth Pierott, Sr., and Daniel Pierott.

 Dr. Gripon testified that in his opinion, as a result of a severe mental disease or defect,
Pierott did not know his conduct was wrong. According to Dr. Gripon, Pierott has 

 a well-established and not even terribly arguable diagnosis of schizophrenia
of the paranoid type. And he has been known and shown over years that when
he takes medication, he gets markedly better; and he gets significantly
stabilized on what we call psychoactive medications. And when he
discontinues taking that same type of medication . . . then he is prone to what
we call developing psychotic symptoms, or psychosis[.]


Dr. Gripon opined that Pierott had suffered from paranoid schizophrenia for at least eight
years. Dr. Gripon explained that when Pierott has stopped taking his medication, "he has
been psychotic and quite ill on numerous occasions; and that has been well-documented in
. . . medical records, in jail records. His records are replete with entries noting the degree to
which he has been chronically schizophrenic and prone to what we call exacerbations. . . ." 
Dr. Gripon testified that the statements he reviewed indicate that Pierott was making
psychotic statements and was delusional.

 Dr. Gripon explained that when he interviewed Pierott the month after Tre-Devin's
death, Pierott "told me that this child wasn't dead, that the child was just released from the
child form. And he said that incorporated in a lot of disconnected, rambling, psychotic
babbling. It was very hard to follow it." Dr. Gripon testified that "[i]t was the psychotic
statements [sic] of a severely mental ill person at that point in time." According to Dr.
Gripon,

 The absence of affect, that it's flat, no apparent emotion, would be consistent
with one being mentally ill to the point where you had committed such a crime
but didn't know that you had actually, truly killed someone, believed they were
in some other form, they had taken on some other type of manifestation, which
is delusional.


Dr. Gripon also noted that severe mental illness can lead to excessive preoccupation with
religion. According to Dr. Gripon, Pierott "had been experiencing religious preoccupation
with delusional thinking, believing that he was . . . some special powered individual."

 When asked whether it was significant that Pierott killed Tre-Devin at night, Dr.
Gripon responded,

 He never told me in the 10 to 12 hours that I spent with him that he waited
until others went to sleep in order to do this. He stated that he had all of these
thoughts about being God and about Kathy and about the children, that he felt
that he was getting messages from God, from the television, from the radio. 
All of that's related to just a severe level of mental illness. He was apparently
unable to sleep. Therefore, he was up. That doesn't mean the other people in
the house couldn't sleep. Therefore, they apparently went to bed.


Pierott told Dr. Gripon that he smothered Tre-Devin and put him in the oven. In addition,
Pierott told Dr. Gripon that

 after he smothered the child, he heard what he thought was some kind of
footprints moving around the house, which he interpreted as some spirit or
some part of this child's nonphysical body moving about that house. And that
he was going to destroy the body so that that spirit . . . couldn't go back and
get back in that body again and then create whatever problems he believed that
was creating.


When asked why Pierott chose to kill Tre-Devin rather than Jacory, Dr. Gripon testified, "I
could not find the reason, that [Pierott] could give me, to rationally explain that. In fact,
Kenneth Pierott told me that in part of these thought processes that he was having . . . that
he didn't know which of these children or whether both [sic] or how this psychotic scene
would play out. As far as I could determine from other individuals, he had no animosity
toward [Tre-Devin]."

 When asked about the fact that Pierott left the scene, Dr. Gripon explained, "I don't
think that tells us anything about his mental state, other than it tells us he wanted to leave at
that point in time." According to Dr. Gripon, Pierott's ability to drive and obey traffic laws
does not show that he was not insane when he killed the child. Dr. Gripon also did not think
Pierott's decision to seek out his family after he killed the child does not indicate whether or
not Pierott knew the killing was wrong. Dr. Gripon further opined that the fact that Pierott
was sometimes more willing to talk with his family than with the authorities did not indicate
that Pierott was malingering. Dr. Gripon also testified that "it's very hard to malinger mental
illness for eight years."

 On cross-examination, Dr. Gripon testified that he had not reviewed all of Pierott's
records from Spindletop MHMR and Vernon State Hospital, and that those records contained
a diagnosis of "psychosis not otherwise specified" rather than paranoid schizophrenia. Dr.
Gripon explained that "[w]hich psychosis you have makes no difference, except academically
in how you would treat it and the way you would explain the prognosis of that treatment." 
Dr. Gripon also testified that he was unaware of Odoms's statement that Pierott felt she was
paying more attention to Tre-Devin than to Jacory. Dr. Gripon opined that Pierott's flight
from the scene and seeking refuge with family does not mean that Pierott knew what he was
doing was wrong.

 According to Dr. Gripon, during a prior psychotic episode, Pierott was found
"completely naked except for a pair of tennis shoes and wandering around in some type of
incoherent state." Dr. Gripon testified that during the episode in which Pierott killed Tre-Devin, Pierott did not demonstrate such behavior. Dr. Gripon explained that stress, sleep
deprivation, drug or alcohol usage, and the degree of the patient's compliance with his
psychiatric medication regimen can all affect how rapidly a patient's condition will worsen. 
Dr. Gripon admitted that in the hours leading up to Tre-Devin's murder, Pierott had relatively
little stress in his life, and some of the witness statements indicated that Pierott had been
taking his medication on some occasions. On re-direct examination, Dr. Gripon opined that
there is "adequate information in this case to lead one to recognize that mental illness was
the major determining factor in this occurrence."

Issue One


 In his first issue, Pierott argues the trial court erred by admitting into evidence eleven
autopsy photographs of the victim. (2) Specifically, Pierott contends the prejudicial effect of
the photographs outweighed their probative value because the pictures were so numerous and
"depicted the same thing, simply from different angles and distances[.]" Rule 403 of the
Texas Rules of Evidence provides as follows: "Although relevant, evidence may be
excluded if its probative value is substantially outweighed by the danger of unfair prejudice,
confusion of the issues, or misleading the jury, or by considerations of undue delay, or
needless presentation of cumulative evidence." Tex. R. Evid. 403.

 We review the trial court's decision to admit the photographs into evidence under an
abuse of discretion standard. Jones v. State, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996);
Rachal v. State, 917 S.W.2d 799, 808 (Tex. Crim. App. 1996). The trial judge has wide
discretion in determining the admissibility of photographs. Sonnier v. State, 913 S.W.2d 511,
519 (Tex. Crim. App. 1995); see also Etheridge v. State, 903 S.W.2d 1, 21 (Tex. Crim. App.
1994). Under Rule 403, the trial court must balance the probative value of the offered
evidence against the prejudice or harm that may result from its admission. Tex. R. Evid.
403; see Montgomery v. State, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990). To be
admissible under Rule 403, a photograph must have some probative value, and its probative
value must not be substantially outweighed by its inflammatory or prejudicial nature. Rojas
v. State, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); Long v. State, 823 S.W.2d 259, 272
(Tex. Crim. App. 1991). The trial court abuses its discretion only when its ruling on
admissibility falls outside the zone of reasonable disagreement. Montgomery, 810 S.W.2d
at 391.

 In his brief, Pierott argues that the autopsy photographs comprising State's Exhibits
30-36 were irrelevant, that they were cumulative of the crime scene photographs, and that
their prejudicial effect substantially outweighed any probative value. However, at trial,
Pierott's counsel did not object that the photographs were not relevant. Rather, counsel
asserted only that the photographs were cumulative of the crime scene photographs, and that
the prejudicial effect of the photographs substantially outweighed their probative value. 
Pierott failed to preserve his argument that the photographs are not relevant. See Tex. R.
App. P. 33.1(a); Goff v. State, 931 S.W.2d 537, 551 (Tex. Crim. App. 1996) (Grounds of
objection raised on appeal must comport with the objections made before the trial court.). 
Accordingly, we review only Pierott's Rule 403 objection asserting that the photographs
were cumulative of the crime scene photographs and that their prejudicial effect substantially
outweighed their probative value. See Tex. R. Evid. 403; Tex. R. App. P. 33.1(a); Goff, 931
S.W.2d at 551.

 With respect to Exhibits 30, 31, 32, 33, 34, 35, and 36, Pierott's trial counsel objected
that the photographs were "cumulative in effect and also . . . highly prejudicial" because the
jury had "already been allowed to see the child at the scene where he was found[.]" See Tex.
R. Evid. 403. We first address Pierott's contention that the photographs were cumulative. 
Prior to the admission of Exhibits 30-36, the State had entered into evidence six crime scene
photographs of Tre-Devin's body as State's Exhibits 14, 16, 17, 18, 19, and 21. (3) Exhibit 14
shows the child from some distance away. He is facing away from the camera, lying on his
side on the open oven door. Only the lower portion of the back of the child's head is visible.
Exhibit 16 is a closer view of the child from the front of the oven, with his lower body
visible. The child's head and face are not visible.

 State's Exhibit 17 shows a view from a similar distance as Exhibit 16, but from the
left side of the oven. The child's left arm and a small part of the upper portion of his face
are visible in the photograph. Exhibit 18 is from the same side of the oven as Exhibit 17, but
it is a closer view of the child. The child's eyes, nose, and part of his mouth are visible. A
white, frothy substance under the child's nose is visible. Exhibit 19 is a close-up of the
center of the child's face with the substance beneath his nose. The sides of the child's head
and his chin are not visible. Exhibit 21 is a view of the child lying on the oven door from a
much greater distance away, and only the child's feet, lower body, and a small part of his left
arm are visible. In each of the crime scene photographs of the child's body, the child's left
arm is on top of his head, obscuring the view of his face and head in some manner,
depending upon the angle from which a given photograph was taken.

 Exhibits 30-36 are 8" x 9" color autopsy photographs printed on 8½" x 11" paper. 
Exhibit 30 shows the full length of the child's body lying on the forensic pathologist's table,
with his arms by his sides, bags covering his hands, and an exhibit card showing the case
number and date placed on his lower abdomen. The child's shirt is pulled up, revealing part
of his torso, and he is barefoot, but otherwise fully clothed. Debris, bruising, and abrasions
are visible on the child's face, arms, torso, and right leg, and a whitish, frothy substance is
visible beneath his nose. Exhibit 31 is a frontal close-up of the child's face, and it shows the
same injuries and debris as Exhibit 30, but in greater detail. Exhibit 32 is a close-up of the
right side of the child's face, with an exhibit tag lying on the child's neck. In Exhibit 32, the
frothy substance is clearly visible both beneath the child's nose and between his lips, and the
carbonaceous debris and abrasions on the right side of the child's face and neck are visible
in significantly greater detail than in Exhibits 30 and 31.

 Exhibit 33 is an extreme close-up of the upper right side of the child's face. The
photograph shows the carbonaceous debris on the child's skin in great detail, and it also
offers a closer view of the bruising and abrasions on the child's right cheek and beneath his
right eye. Exhibit 34 is a close-up photograph, taken from the right side of the child's body,
of the area beneath the child's chin. The right side of the child's face and neck and the upper
portion of the child's shirt are visible, as is the frothy substance beneath his nose. Exhibit
34 clearly shows a large abrasion directly underneath the child's chin, which is not visible
in the other previous photographs. Exhibit 35 is a close-up photograph taken from the left
side of the child's body, and only the area from the child's chest upward is visible. The child
is nude in the photograph, and an exhibit tag is visible on his neck. This photograph shows
a different view of the large abrasion under the child's chin, and the photograph also shows
the presence of abrasions and debris on the child's chest and face, as well as the frothy
substance under his nose. Exhibit 36 is a close-up that focuses exclusively on the child's
torso. The child's shirt is present in the photograph, but it has been pulled up to reveal the
presence of abrasions and carbonaceous debris on the child's torso.

 The record reflects that Dr. Brown testified regarding some of these photographs in
the course of explaining the appearance of the child's body, as well as how the appearance
of the debris on the body assisted him in determining that the child was dead or unconscious
when Pierott put him into the oven. Furthermore, many of the injuries that caused the child's
death were located on his head, face, and neck, yet the crime scene photographs do not fully
reveal those areas because the child's arm obscures them. We find that because of the
numerous angles and injuries each autopsy photograph showed, as well as the different facts
gleaned from each picture regarding the nature of the child's injuries, cause of death, and the
condition of his body, the trial court did not abuse its discretion by determining that Exhibits
30-36 were not cumulative of the crime scene photographs. See Etheridge, 903 S.W.2d at
21 (finding multiple autopsy photos were not cumulative because each showed something
necessary to clearly illustrate the full extent of the injuries and the general state of the body);
see also Bacey v. State, 990 S.W.2d 319, 326 (Tex. App.--Texarkana 1999, pet. ref'd) (When
two or more pictures depict the same thing, but from different perspectives, the jury can gain
information it might not otherwise have when viewing other pictures from other
perspectives.).

 We now turn to Pierott's contention that the photographs comprising State's Exhibits
30-36 were unduly prejudicial. See Tex. R. Evid. 403. Rule 403 favors the admission of
relevant evidence and presumes that relevant evidence will be more probative than
prejudicial. Etheridge, 903 S.W.2d at 21. In determining whether a photograph's
inflammatory, prejudicial nature outweighs its probative value, the trial court should consider
"the inherent tendency that some evidence may have to encourage resolution of material
issues on an inappropriate basis and should balance carefully against it the host of factors
affecting probativeness, including relative weight of the evidence and the degree to which
its proponent might be disadvantaged without it." Fuller v. State, 829 S.W.2d 191, 206 (Tex.
Crim. App. 1992), overruled on other grounds by Castillo v. State, 913 S.W.2d 529 (Tex.
Crim. App. 1995).

 Photographs are generally admissible when verbal testimony as to the matters depicted
in the photos is also admissible. Erazo v. State, 144 S.W.3d 487, 490-91 (Tex. Crim. App.
2004). Autopsy photographs are generally admissible unless they depict mutilation caused
by the autopsy itself. Salazar v. State, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001). On
appeal, we consider: (1) the number of photographs; (2) their size; (3) whether they are in
color or black and white; (4) the detail shown; (5) their gruesomeness; (6) whether the body
is naked or clothed; and (7) "whether the body has been altered since the crime in some way
that might enhance the gruesomeness of the photograph to the appellant's detriment." 
Shuffield v. State, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006), cert. denied, 75 U.S.L.W.
3285, 127 S.Ct. 664, 166 L.Ed.2d 521 (2006); see also Santellan v. State, 939 S.W.2d 155,
171-72 (Tex. Crim. App. 1997); Narvaiz v. State, 840 S.W.2d 415, 429 (Tex. Crim. App.
1992); Long, 823 S.W.2d at 270. "If there are elements of a photograph that are genuinely
helpful to the jury in making its decision, the photograph is inadmissible only if the
emotional and prejudicial aspects substantially outweigh the helpful aspects." Erazo, 144
S.W.3d at 491-92.

 As previously discussed, the photographs demonstrated the appearance of the child's
body and, together with Dr. Brown's testimony and autopsy report, helped to demonstrate
the cause and manner of the child's death. See generally Erazo, 144 S.W.3d at 490-91
(Photographs are generally admissible when oral testimony regarding the same matters would
be admissible.); Ladner v. State, 868 S.W.2d 417, 426 (Tex. App.--Tyler 1993, pet. ref'd)
(Photographs are admissible when they assist a jury in understanding the testimony of a
medical expert.). Because each photograph contained elements that assisted the jury, the
photographs are inadmissible only if their prejudicial aspects substantially outweigh their
helpful aspects. See Erazo, 144 S.W.3d at 491-92. The photographs are not extremely large,
and although they are color photographs, they are not unduly gruesome. See Shuffield, 189
S.W.3d at 787. In addition, photographs 30-36 do not depict injury to the body from the
autopsy. See id. The photographs are emotionally disturbing, but their disturbing effect is
due to the circumstances of the crime and the age of the victim rather than any particular
images depicted in the photographs. The trial court's ruling that the probative value of
State's Exhibits 30, 31, 32, 33, 34, 35, and 36 outweighed any prejudicial effect was within
the zone of reasonable disagreement. See Montgomery, 810 S.W.2d at 391. Therefore, the
trial court did not abuse its discretion by admitting those photographs into evidence.

 We now turn to Pierott's argument regarding the photographs that comprise State's
Exhibits 40, 41, 42, and 43. At trial, Pierott's counsel asserted that the prejudicial effect of
the photographs outweighed their probative value because they showed injuries to the child's
body that were not sustained during the murder. In his brief, Pierott asserts that the presence
of these injuries "could have been misleading to the jurors as to the injuries the child
sustained and, thus, were highly prejudicial and inflammatory."

 Like Exhibits 30-36, Exhibits 40-43 are 8" x 9" color photographs printed on 8½" x
11" paper. Exhibits 40-43 are all close-up views of the child's head and the uppermost
portion of his neck and chest after the forensic pathologist had cleaned the body. Exhibit 40
is a frontal close-up of the child's head and upper torso. The forensic pathologist's large
incisions, which exposed underlying fat and muscle, are visible along the area of the child's
collar bones. An exhibit tag appears on the child's neck. No internal organs are visible. 
Although the incisions are visible, most of the surface area of the photograph consists of the
child's face. The photograph shows multiple bruises and contusions on the child's face,
including a large bruise that covers most of his nose. The photograph also reveals that the
child's lower lip is bruised and swollen.

 Exhibit 41 is a close-up of the child's face and upper torso from the right side. The
same incisions visible in Exhibit 40 are visible in Exhibit 41, albeit from a different angle. 
The incision on the right side of the child's body is partially obscured by an exhibit tag. 
Again, no internal organs are visible, and the focus of the photograph is the child's face. The
angle of the photograph reveals additional details of the bruises and abrasions on the right
side of the child's face that were not fully visible on Exhibit 40. Exhibit 42 is a similar view
as Exhibit 41, but is taken from the left side of the child's body. The same incisions visible
in Exhibits 40 and 41 are partially visible in Exhibit 42, although the incision on the left side
of the child's body is almost totally concealed by an exhibit tag. A small incision at the back
of the child's head, above his ear, is visible, but it is not in sharp focus. The photograph
reveals more of the bruises and abrasions on the left side of the child's face, as well as a
bruise under his arm, the bruise on his nose, and the child's swollen lower lip.

 Exhibit 43 is a close-up of the large horizontal abrasion under the child's chin. The
same incisions visible in the other photographs are visible in this photograph, and the view
into the child's musculature under the incision on the right side of his body is a bit more close
than in the other photographs; however, no internal organs are visible. Exhibit 43 also
reveals the bruises and abrasions on the child's nose, lips, and lower face. An exhibit tag
appears on the child's neck.

 The State may use autopsy or post-autopsy photographs to illustrate injuries and to
reveal the cause of death. Ladner, 868 S.W.2d at 426. As long as a post-autopsy photograph
aids the jury in understanding the victim's injury and does not emphasize mutilation caused
by the autopsy, the photograph is admissible despite the fact that it depicts the autopsy. 
Harris v. State, 661 S.W.2d 106, 107-08 (Tex. Crim. App. 1983) (en banc); Todd v. State,
911 S.W.2d 807, 819 (Tex. App.--El Paso 1995, no pet.). Injuries caused by the autopsy
process are of minor significance if the disturbing nature of the photograph is primarily due
to the injuries caused by the appellant. Hayes v. State, 85 S.W.3d 809, 816 (Tex. Crim. App.
2002); Santellan, 939 S.W.2d at 173.

 Here, although incisions and, to some degree, fat and underlying musculature, are
visible in each of the photographs, the photographs are not unduly gruesome, and their focus
is the injuries on the child's face, neck, and head, not the mutilation from the autopsy
procedure. See Harris, 661 S.W.2d at 107; Todd, 911 S.W.2d at 819. Dr. Brown discussed
the photographs in describing what the autopsy revealed regarding the child's injuries and
cause of death, and he did not mention the incisions. In addition, State's Exhibit 35, which
depicts the child's upper torso as it appeared before Dr. Brown cleaned the body, clearly
shows that the incisions had not been made before the autopsy, and Dr. Brown's report
describes making the incisions during the course of the autopsy. Therefore, there is little
danger that the presence of the incisions in Exhibits 40-43 confused the jury regarding the
nature of the injuries Pierott inflicted upon the child.

 The photographs showed additional details of the child's injuries that were not visible
in the photographs of the child's body before the pathologist cleaned away the debris. 
Therefore, the photographs were probative in that they aided the jury in understanding the
child's injuries and cause of death. See Ladner, 868 S.W.2d at 426. Furthermore, although
State's Exhibits 40-43 are disturbing, the primary reasons that is so are the circumstances of
the crime and the age of the victim, not the fact that the victim's body was undergoing an
autopsy. See Hayes, 85 S.W.3d at 816; Santellan, 939 S.W.2d at 173. The trial court's
ruling that the probative value of State's Exhibits 40, 41, 42, and 43 outweighed any
prejudicial effect was within the zone of reasonable disagreement. See Montgomery, 810
S.W.2d at 391. Therefore, the trial court did not abuse its discretion by admitting those
photographs into evidence. We overrule Pierott's first issue.

Issue Two


 In his second issue, Pierott asserts the evidence was factually insufficient to support
his conviction. Specifically, Pierott contends "there was insufficient evidence for the jury
to find him guilty instead of not guilty by reason of insanity." Section 8.01(a) of the Texas
Penal Code provides as follows: "It is an affirmative defense to prosecution that, at the time
of the conduct charged, the actor, as a result of severe mental disease or defect, did not know
that his conduct was wrong." Tex. Pen. Code Ann. § 8.01(a) (Vernon 2003). Because
insanity is an affirmative defense, a defendant must prove by a preponderance of the
evidence that he was insane when he committed the offense. Meraz v. State, 785 S.W.2d
146, 150 (Tex. Crim. App. 1990). "[T]he existence of a mental disease, alone, is not
sufficient to establish legal insanity; rather, the accused must have been mentally ill at the
time of the offense to the point that he did not know his conduct was wrong." Nutter v. State,
93 S.W.3d 130, 132 (Tex. App.--Houston [14th Dist.] 2001, no pet.).

 In reviewing the factual sufficiency of an affirmative defense, the proper standard is
whether, considering all of the evidence relevant to an appellant's affirmative defense of
insanity, "'the judgment is so against the great weight and preponderance of the evidence so
as to be manifestly unjust.'" Bigby v. State, 892 S.W.2d 864, 875 (Tex. Crim. App. 1994)
(quoting Meraz, 785 S.W.2d at 155). "The issue of insanity is not strictly medical; it also
invokes both legal and ethical considerations." Bigby, 892 S.W.2d at 877. "'Ultimately the
issue of insanity at the time of the offense excusing criminal responsibility lies in the
province of the jury, not only as to the credibility of the witnesses and the weight of the
evidence, but also as to the limits of the defense itself.'" Id. at 878 (quoting Graham v. State,
566 S.W.2d 941, 952 (Tex. Crim. App. 1978) (en banc)).

 The trier of fact may consider such evidence as the appellant's demeanor
before and after the offense, appellant's attempts to evade police, attempts to
conceal incriminating evidence, appellant's expressions of regret or fear of the
consequences of [his] actions, other possible motives for the offense, and other
explanations for appellant's behavior.


Torres v. State, 976 S.W.2d 345, 347-48 (Tex. App.--Corpus Christi 1998, no pet.) (citations
omitted); see also Aschbacher v. State, 61 S.W.3d 532, 535 (Tex. App.--San Antonio 2001,
pet. ref'd).

 The question before the jury was whether Pierott had a mental disease or defect that
prevented him from knowing that his conduct was wrong. See Tex. Pen. Code Ann.
§ 8.01(a). As previously discussed in detail, both Dr. Silverman and Dr. Gripon described
Pierott's delusions and opined that when Pierott killed Tre-Devin, he was suffering from
paranoid schizophrenia which caused him to become psychotic, and as a result, Pierott did
not know that his conduct was wrong. Various lay witnesses testified regarding Pierott's
numerous bizarre statements and behaviors before and after the murder. Specifically,
Odoms, Daniel, and Kenneth described Pierott's preoccupation with religion, his belief that
he was God and master of the planet, his belief that he was reading people's minds or people
were reading his mind, the fact that Pierott behaved as though he heard voices, Pierott's
belief that he needed to kill Tre-Devin so Jacory could live, and Pierott's belief that Tre-Devin was not truly dead. The detectives who investigated the crime offered similar
testimony regarding Pierott's statements and behaviors after the murder.

 The jury also heard testimony that Pierott killed Tre-Devin at night by smothering
him, and that although he removed metal racks from the oven, Odoms did not hear him do
so. After smothering Tre-Devin, Pierott placed the child's body in the oven and attempted
to destroy the child's body by turning on the oven and turning on the burners on the stove. 
Although Pierott did not drive, he fled the scene in Odoms's car when Odoms began to
gather clothes for the children. After fleeing the scene, Pierott sought out his brother. In
addition, the jury heard testimony that Pierott felt Odoms paid more attention to Tre-Devin
than to Jacory, Pierott was jealous of Tre-Devin's father, and it bothered Pierott that Tre-Devin's father was white. The jury further heard testimony that although Pierott freely
discussed the murder with his brother, his father, Dr. Silverman, and Dr. Gripon, he was
more reticent when questioned by the authorities. Although both Dr. Silverman and Dr.
Gripon testified that these circumstances do not necessarily indicate that Pierott knew his
conduct was wrong, it was within the province of the jury to weigh the credibility of the
witnesses, and to determine for itself the importance of Pierott's behavior. See Bigby, 892
S.W.2d at 878; Graham, 566 S.W.2d at 950 (The State need not present expert medical
testimony that a defendant is sane to counter defense expert's testimony regarding insanity,
and the jury may not give conclusive effect to an expert's opinion merely because it is not
challenged by another expert.).

 There was evidence which, if believed by the jury, supported the jury's rejection of
Pierott's affirmative defense of insanity. See Bigby, 892 S.W.2d at 877-78; Aschbacher, 61
S.W.3d at 535; Torres, 976 S.W.2d at 347-48. Therefore, the verdict is not so against the
great weight and preponderance of the evidence as to be manifestly unjust. See Bigby, 892
S.W.2d at 875. We overrule Pierott's second issue and affirm the trial court's judgment.

 AFFIRMED. 

 

 STEVE McKEITHEN

 Chief Justice

Submitted on August 21, 2007

Opinion Delivered September 12, 2007

Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.

 

CONCURRING OPINION



 I concur in the court's resolution of the case, but write separately to clarify my
reasoning in affirming the jury's rejection of Pierott's insanity defense. The issue for the jury
in a case in which the defendant relies on the affirmative defense of insanity is whether the
defendant knew the difference between right and wrong at the time the crime was committed. 
In my opinion, even though no medical witnesses testified that Pierott knew the difference
between right and wrong, there was evidence introduced before the jury that he knew the
difference. That evidence allowed the jury to reject the opinions of Dr. Gripon and Dr.
Silverman that Pierott did not know the difference between right and wrong at the time he
committed the offense. 

 The jury heard testimony from Kathy Odoms that when she awoke and told Pierott
that she had to get the children dressed, Pierott, who did not have a driver's license and had
never driven, took her car and left. In my opinion, Pierott's choice to flee when the victim's
mother began to look for her child is evidentiary of Pierott's consciousness that he had done
something wrong, and is sufficient to support the jury's inference that he knew killing Tre-Devin was wrong. "Evidence of flight or escape is admissible as a circumstance from which
an inference of guilt may be drawn." Bigby v. State, 892 S.W.2d 864, 883 (Tex. Crim. App.
1994); Cantrell v. State, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987); Cardenas v. State, 971
S.W.2d 645, 649 (Tex. App.-Dallas 1998, pet. ref'd). 


 Additionally, the jury heard testimony from which it could conclude that Tre-Devin's
murder was not a random act of violence directed toward a random victim. "The
circumstances of the crime itself are always important in determining the mental state of the
accused at the commission of the offense." Graham v. State, 566 S.W.2d 941, 951 (Tex.
Crim. App. 1978). From the testimony before it, the jury could conclude that Pierott was
jealous of Odom's relationship with Tre-Devin, who was his biological son's rival for
Odom's attention. Pierott had also expressed his displeasure that Tre-Devin's father was
white. Dr. Gripon stated that he could think of no reason to explain why Pierott killed Tre-Devin because he had no animosity toward him. Odom's testimony, however, offered the
jury an explanation. Further, Dr. Silverman testified that his opinion about Pierott might
change had he been present to hear Daniel Pierott's testimony. Thus, the jury had valid
reasons to reject the doctors' opinions on whether Pierott knew right from wrong when he
killed Tre-Devin.

 "In deciding the ultimate issue of sanity, only the jury can join the non-medical
components that must be considered in deciding the ultimate issue." Bigby, 892 S.W.2d at
878. A person may be medically insane, and yet remain criminally responsible for his
conduct if, when he commits the crime, he could distinguish right from wrong. Graham, 566
S.W.2d at 949. Because the jury could conclude from the circumstances of this crime that
the violence was not random, and that Pierott subsequently left the scene in order to avoid
facing the consequences of killing Odoms's son, the jury's finding rejecting Pierott's insanity
defense is not so against the great weight and preponderance of the evidence so as to be
manifestly unjust. Because I agree that the jury could reject Pierott's insanity defense based
on the evidence presented, I agree that Pierott's murder conviction should be affirmed.

 

 ____________________________

 HOLLIS HORTON

 Justice


Concurrence Delivered

September 12, 2007 




1. In the trial court's judgment, appellant's surname is spelled "Pierrot."
2. The Court admitted the photographs about which Pierott complains as State's
Exhibits 30, 31, 32, 33, 34, 35, 36, 40, 41, 42, and 43.
3. Pierott's counsel did not object to the admission of Exhibits 14, 16, 17, 18, 19, and
21.